IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RANDALL L. COWGER,

        Plaintiff,

v.                                Civil Action No. 1:07-CV-59

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION CLAIMANT'S MOTION FOR SUMMARY
JUDGMENT BE DENIED, AND ORDER GRANTING
CLAIMANT'S MOTION TO SUPPLEMENT THE RECORD WITH LOST
DOCUMENT.**

**I. Introduction**

A.    <u>Background</u>

Plaintiff, Randall Cowger, (Claimant), filed his Complaint on May 1, 2007, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1] Commissioner filed his Answer on

November 6, 2007.[2] Claimant filed his Motion for Summary Judgment on December 6, 2007,

and his Motion for Leave to File and Supplement Record with Lost Document on December 14,

2007.[3] Commissioner filed his Motion for Summary Judgment on January 3, 2008.[4]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket Nos. 11, 12.

[4] Docket No. 14.

1. <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

2. <u>Plaintiff's Motion to Supplement the Record with Lost Document</u>.

3. <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

I recommend that:

1. Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because 1) the ALJ's determination of Claimant's physical RFC is supported by substantial evidence; 2) the ALJ's treatment of Dr. Mace's, Ms. Cutlip's, Mr. Lohr's, and Ms. Bucks' reports was proper and supported by substantial evidence; 3) the ALJ's treatment of Ms. Hagan's report is supported by substantial evidence; and 4) the ALJ complied with SSR 96-8p.

2. Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits and Supplemental Security Income on March 16, 2004, alleging disability since January 30, 2004 due to back and hip injuries. (Tr. 134). The application was initially denied on June 18, 2004 and upon reconsideration on August 24, 2004. Claimant requested a hearing before an ALJ. The first hearing was held March 23, 2005, and a second hearing was held on January 26, 2006. On February 23, 2006, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council but was denied. Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 37 years old on the date of the March 23, 2005 hearing before the ALJ, and

38 years old on the date of the January 26, 2006 hearing before the ALJ.  Claimant completed

the eighth grade, and has prior work experience as a timber cutter and skidder.  (Tr. 126).

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: January 30, 2004 through February 23, 2006:

**W.D. Lohr, D.C., 3/3/04 (Tr. 207)**
Attending Physician's Disability Certification, Return to Work Recommendations
I am the attending physician for the patient named above. To avoid aggravation to his condition,
I recommend the following:
>Patient may return to work with the degree of work and limitations indicated:
>Degree:
>>Light work. Lifting 20 pounds maximum with frequent lifting and/or carrying of
>>objects weighing up to 10 pounds.  Even though the weight lifted may be only a
>>negligible amount, a job is in this category when it requires walking or standing
>>to a significant degree or when it involves sitting most of the time with a degree
>>of pushing and pulling or arm and/or leg controls.
>Limitations:
>>In an 8 hour work day patient may stand/walk 4-6 hours; sit 1-3 hours; and drive
>>1-3 hours.
>>Patient may use hands for repetitive single grasping, pushing and pulling, and fine
>>manipulation.
>>Patient may use feet for repetitive movements in operating foot controls: No
>>Patient is able to bend occasionally; squat frequently; climb occasionally.
>Other instructions and/or limitations:
>>Light work restrictions are permanent at this point in time.

**Dr. Sabio, M.D., 5/31/04 (Tr. 208)**
Chief complaints: hypertension, low back pain, and left hip pain.
Extremities: There is tenderness over the left hip.  There is no redness, swelling, or effusion in
any of the joints of the upper and lower extremities.  He did not have Heberden's nodes,
rheumatoid nodules or Bouchard's nodes.  The patient did not have edema or cyanosis.
Spine: There is a normal spinal curvature.  There is tenderness over the spinal processes of the
lumbar spine.  There was no kyphosis or scoliosis.  The patient has tenderness over the sacroiliac
joints on both sides.
Diagnostic Impression: Hypertension, chronic back strain and chronic left hip strain.

**Dean Ball, D.O., 5/27/04 (Tr. 213)**
Lumbar Spine: Frontal and lateral views of the lumbar spine were obtained and reveals no fracture or destructive process. There is marked narrowing involving the L5-S1 intervertebral discs. The remaining intervertebral discs are of normal height. There is mild degenerative changes involving the upper lumbar spine.

**Thomas Lauderman, D.O., 6/7/04 (Tr. 216)**
Physical Residual Functional Capacity Assessment
Exertional Limitations
> Occasionally lift and/or carry- 50 pounds
> Frequently lift and/or carry - 25 pounds
> Stand and/or walk - about 6 hours in an 8-hour workday.
> Sit - about 6 hours in an 8 hour workday
> Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations: none established
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Unlimited
Symptoms: Claimant alleges back and hip pain syndrome along with HTN. Claimant takes ___ for pain. Claimant states he still hunts, swims, paints, fishes, woodworking, walking, etc., depending on how he feels. Credibility is an issue. Claimant states under Activities and Interest he watches TV about 3 hours per day and listens to radio. RFC is reduced, pain and fatigue considered.

**Attending Physician, Webster County Memorial Hospital, 7/26/04 (Tr. 229)**
Diagnosis: Back pain . . . .

**Attending Physician, Webster County Memorial Hospital, 5/19/04 (Tr. 231)**
Diagnosis: Depression, HTN, GERD.

**Attending Physician, Webster County Memorial Hospital, 5/5/04 (Tr. 232)**
Diagnosis: HTN, anxiety/depression, ___ pain syndrome, ___.

**Debbie Cutlip, PA-C, West Virginia Department of Health and Human Resources, Physical Examination, 7/26/04 (Tr. 247)**
Describe in detail any pain: persistent sharp pain with burning _____.
Diagnosis:
> Major: muskuloskeletal back pain with __.
> Minor: ulnar nerve compression.

Applicant's ability to work full-time:
> 1) Is applicant able to work full time at customary occupation or like work? No. Patient cannot lift, sit, stand prolonged periods of time.
> 2) Is applicant able to perform other full time work? No. Patient needs further testing to

evaluate ulnar nerve and ___.
3) What work situations, if any, should be avoided? Heavy lifting, sitting, standing.
4) Duration of inability to work full time: one year
Recommendations for further tests or treatment:
Diagnostic tests: MRI low back, EMG R upper ext.
Specialists Consultations: neurosurgeon.
Should applicant be referred for vocation rehabilitation? Yes.

**Cynthia Osborne, D.O., 8/12/04 (Tr. 249)**
Physical Residual Functional Capacity Assessment
Exertional Limitations
Occasionally lift and/or carry- 50 pounds
Frequently lift and/or carry - 25 pounds
Stand and/or walk - about 6 hours in an 8-hour workday.
Sit - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: none established
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Unlimited
Symptoms: Claimant appears to be credible, although symptoms are exaggerated. Claimant has complaints of back pain with some decreased ROM but no focal neuro deficits. There is tenderness in the left hip and the SI joints. Gait is normal. Able to heel, toe, and tandem walk as well as squat. X-ray show some degenerative changes in 1-spine. Complaints seem out of proportion to expected. RFC set at medium.

**Dr. Leef, M.D., Braxton County Memorial Hospital, 10/19/04 (Tr. 257)**
Impression:
1) Mild subligamentous disc herniation L5-S1 central and right with associated degenerative change.
2) Degenerative changes L1-2.

**United Hospital Center, 10/14/04 (Tr. 264)**
Summary: 1) Median motor and sensory studies were normal on the right side. 2) Ulnar motor and sensory studies were normal on the right side. 3) Electromyography was normal and was not supportive of the C5-T1 radiculopathy on the right side.
Impression: This study is normal and is not supportive of carpal tunnel syndrome, ulnar neuropathy, or C5-T1 radiculopathy on the right side.

**Attending Physician, Webster County Memorial Hospital, 10/26/04 (Tr. 267)**
Diagnosis: Musculoskeletal back pain - scoliosis, bilateral shoulder bursitis (rare).

**Attending Physician, Webster County Memorial Hospital, 10/12/04 (Tr. 268)**

<u>Diagnosis</u>: Back pain.

**Dr. William Tan, Webster County Memorial Hospital, 10/26/04 (Tr. 269)**
<u>Impression</u>:
1) Straightening of the lumbar curvature likely related to positioning or muscle spasm.
2) Degenerative disco genic disease at the level of L5-S1.

**Attending Physician, Webster County Memorial Hospital, 9/13/04 (Tr. 270)**
<u>Diagnosis</u>: HTN well controlled. Depression - __.

**Attending Physician, Webster County Memorial Hospital, 8/9/04 (Tr. 272)**
<u>Diagnosis</u>: HTN ___; GERD; Depression.

**Dr. Kazi, M.D., Tri State Occupational Medicine, 4/5/04 (Tr. 300)**
<u>Physical Examination</u>: Claimant walks with a normal, steady gait. He does not require the use of an assistance device.
<u>Impression</u>: Lower back pain.
<u>Summary</u>: . . . On today's examination, there were range of motion abnormalities of the lumbar spine.

     1) The claimant has reached maximum medical improvement.  No further medical or surgical intervention will change his condition.

     2) The claimant is currently not working.  He should be referred to a work conditioning and work hardening program, so that he may be sent back to work.  His physician may also prescribe Neurontin, amitriptyline or Topamax for his lower back pain.  He may also benefit from an antidepressant, which would most probably improve his lower back pain.

     3) The following impairment rating is recommended: . . . The claimant is entitled to two percent impairment of the whole person for the lumbar spine injury dated May 11, 2001.

**Disability/Incapacity Evaluation, 8/3/04 (Tr. 306)**
-Is the material submitted sufficient to permit a determination? Yes.
-After considering all information a decision has been made that the above client is: Disabled,
     SSI-Related Medicaid Age 18 or over.
<u>Remarks</u>
     Is the client currently performing substantial gainful activity? No
     Does the client have a medically determinable impairment or combination of
     impairments which significantly limits ability to perform basic work activity? Yes.
     Does the client's impairments meet or equal the listing of impairments? Yes
<u>Reevaluation</u>: The information submitted indicates that the case must be reevaluated on 7/05 unless the Worker determines that the client needs an earlier evaluation.

**William Lohr, D.C., 3/16/05 (Tr. 308)**
<u>Residual Functional Capacity Assessment</u>
4) Have you in the past or are you presently treating Mr. Cowger? Yes
5) If yes, how long have you been the treating physician? 5/11/02 to 3/16/05

6) When did you last examine this person? 3/16/05

7) Please state this person's past relevant medical history: history of low back pain crushed left leg in his 20s.

8) Please describe present Diagnoses: __

9) As to each diagnosis, please state upon what clinical findings, laboratory tests and other data the diagnosis is based: MRI, LS5 disc degeneration with disc bulging at some level.

10) Impairments and symptoms alleged by claimant

> Hx. Muskoskeletal back pain
> Hx chronic back strain, chronic hip strain
> Low back pain syndrome, hip pain syndrome
> Left forearm tendinitis
> Back and Flank pain
> Chronic back pain
> Hypertension
> History of depression
> Gastritis
> Pain in low back
> Increased depression secondary to pain
> Parasthesia 4th and 5th digits
> Bilateral shoulder bursitis

10B) Are the above listing impairments/symptoms consistent or inconsistent with your clinical records and observations? Yes

11) Which, if any, of the following levels of work-activity would the patient be capable of doing for an 8-hour day based upon their physical impairments alone?

> Heavy: Walking and standing most of the time lifting 50 pounds frequently and up to 100 pounds occasionally: No

> Medium: Walking and standing most of the time lifting 25 pounds frequently and up to 50 pounds occasionally: No

> Light: A significant amount of walking and standing lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling: No, could maybe perform with ___.

> Sedentary: Sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds.: Yes.

12) Must patient alternate positions frequently? Yes, due to pain and stiffness.

13) Does the patient need a sit/stand option in order to vary the positions frequently?: Yes, with frequency and duration of pain.

14) How long would the patient be able to perform the following activities in view of these Physical impairments:

> Sit at one time: 30 minutes
> Stand at one time: 10 minutes
> Walk at one time: 30 minutes
> If alternately walking and standing were combined, how many total hours per 8-hour work day would patient be able to be up ono his/her feet? 3-4 hours.

15) Would it be advisable or necessary for the patient to recline or lie down during the day, with

feet up? Yes, with knees bent.

16) Would it be advisable for the patient to have frequent rest periods sitting, during the day? Yes.

17) Would the patient be restricted from performing any of the following activities due to their physical impairments, alone? No.

> Climbing/Kneeling/Crouching/Crawling - Infrequent, a few times in an 8 hour day.
>
> Balancing/Stoop/Bend - Never perform
>
> Stretching/Squatting - Occasional (up to 1/3 of an 8 hour day or 2.5 hours).
>
> Reaching - other

18) Does patient's condition prevent work activity that involves any of the following?

> Machinery, jarring, or vibrations/ Cold or hot temperatures/ Fumes dust: - avoid even moderate exposure.
>
> Noise: Unlimited.

19) Would the patient be expected to experience chronic pain on the basis of the impairments found by you? Yes, chronic moderate to severe.

20) Would patient be expected to experience intermittent pain that would be considered severe? Yes.

21) In order for the patient to be able to stand or walk, does the patient need an assisting device such as: No.

25) If patient is advised to elevate the feet, please indicate the frequency and reason for this instruction: reclined with knee bent to relieve low back pain.

26) Can the patient use feet/legs for repetitive movements such as in pushing or pulling leg-feet controls? No, patient should avoid sitting.

27) Can patient use hands for repetitive action in a job where repetition or prolonged use of hands is required?

> Simple grasping: Right hand, yes; left hand, yes.
>
> Fine manipulation: Right hand, yes; left hand, yes.

28) Is the claimant able to sit upright for prolonged periods of time at a desk, console, etc with his/her head in a forward flexed position? No, due to low back.

29) In your opinion, is the patient capable of performing any full-time job, that is 8 hours per day, five days per week, on a sustained basis? No.

30) Do you feel this person was disabled from ALL full-time work activity from 12/1/99 through the present? No. Patient is only able to perform sedentary to light work load on an infrequent basis for short periods of time.

31) In your opinion, how many days would the claimant be expected to be absent from the workplace? Unable to determine.

**Attending Physician, Webster County Memorial Hospital, 2/25/05 (Tr. 329)**
Diagnosis: C.P. ___, HTN, Muskoskeletal back pain.

**Attending Physician, Webster County Memorial Hospital, 11/23/04 (Tr. 332)**
Diagnosis: Chronic back pain . . .

**Dr. Mace, M.D., Debbie Cutlip, PA-C, West Virginia Department of Health and Human**

**Resources, 3/25/05 (Tr. 334)**

Diagnosis:

    Major: muskuloskeletal back pain with __.

    Minor: ulnar nerve compression.

Applicant's ability to work full-time:

    1) Is applicant able to work full time at customary occupation or like work? No. Patient cannot lift, sit, stand prolonged periods of time.

    2) Is applicant able to perform other full time work? No. Patient needs further testing to evaluate ulnar nerve and ___.

    3) What work situations, if any, should be avoided? Heavy lifting, sitting, standing.

    4) Duration of inability to work full time: one year

Recommendations for further tests or treatment:

    Diagnostic tests: MRI low back, EMG R upper ext.

    Specialists Consultations: neurosurgeon.

Should applicant be referred for vocation rehabilitation? Yes.

**Cynthia Hagan, MA, Psychological Evaluation, 3/17/05 (Tr. 337)**

Diagnostic Impression

    Axis I: 311 Depressive Disorder NOS

           300.00 Anxiety Disorder NOS

    Axis II: V62.89 Borderline Intellectual Functioning

    Axis III: Lower back pain that radiates throughout his lower extremities, numbness in lower extremities, shoulder pain and headaches.

    Axis IV: Economic Problem: low income

         Vocational Problem: unemployed

    Axis V: 51

Summary/Recommendations: Mr. Cowger is a 37-year-old Caucasian male who was referred to assess his depressive and anxious symptoms. He is also applying for disability benefits. His cognitive functioning was measured within the Borderline range. His achievement scores in Spelling and Arithmetic were slightly lower than his ability level but commensurate. Mr. Cowger's personality profile indicates that he has much psychological distress and difficulty adjusting psychologically. Randall reported severe depressive thoughts and feelings at a substantially higher level than is seen in 97% of clients. He reports inconsolable sadness, melancholia, feeling of loss, a sense of helplessness, and perhaps some self-pity as well. He also reports a high level of physical symptoms, suggesting the presence of vegetative depression and autonomic anxiety. It should be noted that results greatly differed from the BDI, in which Mr. Cowger reported a mild amount of depression. However, the Battery for Health Improvement is a more sophisticated instrument. On his BAI, he reports that he is experiencing a moderate amount of anxiety.

The following recommendations are made: Mr. Cowger should be referred to a psychiatrist to assess the need for medications. He should also obtain counseling to address his depressive and anxious conditions. Clinicians may find that an instructional approach more beneficial than an insight oriented approach. He should be referred to a pain treatment clinic to learn new coping skills to deal with chronic pain.

**Cynthia Hagan, M.A., Mental RFC Capacity Assessment, 4/4/05 (Tr. 345)**

Limitations in understanding, remembering, and carrying out instructions:

Understand and remember short, simple instructions: moderate

Carry out short, simply instructions: moderate

Understand and remember detailed instructions: moderate

Carry out detailed instructions: moderate

Exercise judgment or make simply work-related decisions: moderate

> His borderline intellectual functioning as measured on the WAIS III indicted cognitive __, as below average, this combined with his poor academic skills and depression and anxious symptoms would __ with recall of instructions and inconsistent performance.

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:

Sustained attention and concentration for extended periods: moderate

Maintaining regular attendance and punctuality: moderate

Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

> Depressive symptoms and anxious symptoms and limited concentration would likely lead to inconsistent work performance.

Limitations in social functioning in a normal competitive work environment:

Interacting appropriately with the public: mild

Responding appropriately to direction and criticism from supervisors: mild

Working on co-ordination with others without being unduly distracted by them: mild

Working in co-ordination with others without unduly distracting them: mild

Maintaining acceptable standards of grooming and hygiene: none

Maintaining acceptable standards of courtesy and behavior: mild

Relating predictably in social situations in the workplace without exhibiting behavioral extremes: mild

Demonstrating reliability: moderate

Ability to ask simple questions or request assistance from coworkers or supervisors: none

> Depression and anxiety lead to frustration tolerance that is below average also, personality profile indicated he may respond inappropriately under stress.

Adaptation in a work-setting

Ability to respond to changes in the work setting or work processes: moderate

Ability to be aware of normal hazards and take appropriate precautions: mild

> Low cognitive ability will increase time necessary to understand and adjust to changes in routine.

Functioning independently in a competitive work-setting

Carrying out an ordinary work routine without special supervision: mild

Setting realistic goals and making plans independently of others: moderate

Traveling independently in unfamiliar places: mild

> Personality profile indicates difficulties with planning and other executive functioning. Also, low cognitive ability would likely contribute.

Limitations in work adjustment

Ability to tolerate ordinary work stress: moderate
    Depression and anxiety decrease frustration and stress tolerance.
Duration of impairments/limitations
    This person has alleged disability to work since 12/01/99.  The period under
    consideration extends from 12/01/99 through present.
    Do you feel that the impairments and limitations which you have identified have
    probably existed at their current level of severity since 12/01/99, the alleged onset date?
    Yes


**Cynthia Hagan, M.A., Psychiatric Review Technique, 4/4/05 (Tr. 351)**
-Categories upon which the medical disposition is based: 12.04 Affective Disorders
-12.04 Affective Disorders: Depressive syndrome characterized by the following: 1) Anhedonia
or pervasive loss of interest in almost all activities, 2) Psychomotor agitation or retardation, 3)
decreased energy, 4) difficulty concentrating or thinking.
-A medically determinable impairment is present that does not precisely satisfy the diagnostic
criteria above: Disorder 300.00 Anxiety DO NOS.
    Pertinent symptoms, signs, and laboratory findings that substantiate the presence of this
impairment: Anxious symptoms such as fear of worst happening and inability to relax __
combined with some physical symptoms such as ___. These symptoms are associated with
worries about his health and finances.
-Degree of Limitation:
    Restriction of Activities of Daily Living: Mild
    Difficulties in Maintaining Social Functioning: Mild
    Difficulties in Maintaining Concentration, Persistence, or Pace: Moderate
    Episodes of Decompensation, Each of Extended Duration: One or Two


**Kathy Bucks, P.T., Functional Capacity Evaluation, 1/4/02 (Tr. 372)**
Assessment:
-This client was friendly and cooperative throughout the exam.  He appeared to put forth
reasonable effort.  He presented limited mobility and strength throughout the exam.  Extremity
mobility and strength are within functional limits.  His general movement pattern is synergistic
and fluid.  Gait is without limp short distances. His gait progresses to a mild limp after 500 feet
distance.
-Based upon client's performance today, Mr. Cowger would be placed in a physical demand
level (PDL).  This suggests that he is currently able to lift 15 pounds occasionally (1-32 reps/day
every 15 minutes), 7 pounds frequently (33-200 reps/day or every 3 minutes) and negligible
pounds constantly or unlimited (greater than 200 reps/day) within his current limit of tolerance.
According to case manager Lori Hager, this client's employer has indicated that he is willing to
accommodate any job modification needed.  Mr. Cowger states that he feels he could complete
the job duties of warehouse at his pre-injury.


**Attending Physician, Webster County Memorial Hospital, 4/12/05 (Tr. 472)**
Diagnosis: . . . Chronic back pain.

11

**Attending Physician, Webster County Memorial Hospital, 3/11/05 (Tr. 473)**
Diagnosis: HTN, Muskoskeletal pain.

**Attending Physician, Webster County Memorial Hospital, 7/26/05 (Tr. 484)**
Diagnosis: Muskoskeletal pain with ___, DHHR PE.

**Attending Physician, Webster County Memorial Hospital, 5/31/05 (Tr. 485)**
Diagnosis: HTN, back pain.

**Debbie Cutlip, PA-C, West Virginia Department of Health and Human Resources, 7/26/05 (Tr. 493)**
Diagnosis: Major: muskuloskeletal back pain with __.
Applicant's ability to work full-time:
      1) Is applicant able to work full time at customary occupation or like work? No. Patient needs to be able to frequently change positions.
      2) Is applicant able to perform other full time work? Yes. Probably sitting at a desk with retraining.
      3) What work situations, if any, should be avoided? Lifting, ___, prolonged sitting, standing.
      4) Duration of inability to work full time: one year
Recommendations for further tests or treatment:
      Diagnostic tests: needs MRI and ___.
      Specialists Consultations: neurosurgeon.
Should applicant be referred for vocation rehabilitation? Yes.

**Dr. Clark, M.D., Disability/Incapacity Evaluation, 11/3/05 (Tr. 496)**
-Is the material submitted sufficient to permit a determination? Yes.
-After considering all information a decision has been made that the above client is: Disabled, SSI-Related Medicaid Age 18 or over.
Remarks
      Is the client currently performing substantial gainful activity? No
      Does the client have a medically determinable impairment or combination of impairments which significantly limits ability to perform basic work activity? Yes.
      Does the client's impairments meet or equal the listing of impairments? Yes
Reevaluation: The information submitted indicates that the case must be reevaluated on 11/06 unless the Worker determines that the client needs an earlier evaluation.

**Seneca Health Services, Inc., 12/6/05 (Tr. 498)**
Summary of problems identified in assessment: Randall is experiencing anxiety which has exacerbated due to his inability to work.  Randall is experiencing mild phobia such as uncomfortable feelings that trucks will wreck into his home.  He lives near the road.
Individual therapy plan narrative: Randall will address his issues in therapy.
Problem List: 1) Anxiety, 2) Phobia's mild (to be addressed in therapy).

**Attending Physician, Webster County Memorial Hospital, 12/2/05 (Tr. 501)**
Diagnosis: HTN, back pain secondary to injury, depression.

**Dr. Lois Urick, M.D., Seneca Health Services, 2/1/06 (Tr. 512)**
MSE: The patient is AOX4, exhibits good dress/grooming/hygiene, has good eye contact and no psychomotor abnormality. Manner is appropriate and polite. Affect is euthymic, mood "not too bad." Speech is WNL in rate, tone and content. Thoughts are goal-directed, and there is no evidence of delusional content. Attention, concentration and impulse control are intact, and sensorium is clear. Cognition appears intact and intelligence is estimated as slightly below average. Recent and remote memory appears grossly intact. The patient denies auditory and visual hallucinations, and lethal ideation. Insight is fairly good, judgment is good.
Diagnosis:
      Axis I: 300.00 Anxiety Disorder NOS
      Axis II: V62.89 Borderline Intellectual Functioning (by prior psychological testing)
      Axis III: Diagnosis deferred - patient reports chronic hip and back pain.
      Axis IV: Problems with social environment.
      Axis V: GAF 65
Prognosis: Fair
Recommendations: 1) In order to address anxiety, as the patient identifies as being somewhat distressing to him, we will try Paxil 20 mg qd; 2) The patient is encouraged to participate in supportive counseling; 3) Crisis intervention as appropriate; 4) RTC 1 month.

D.      Testimonial Evidence

      Testimony was taken at the March 23, 2005 and January 26, 2006 hearings. The

following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 536)

      Q      Okay. All right. Now, asking you about the things that bother you now. Tell me

what's going on with your back?

      A      It just started constantly hurting. If I sit too long, if I stand too long and walk. If

I bend over, it, it give me with that. Lying down makes it hard to sleep.

      Q      Okay. Well, where in your back does it hurt?

      A      My lower back and down to my left hip. I need to stand up.

      Q      Okay.

ATTY        I'm sure that's okay with you, Judge?

ALJ         Yeah.  Sure.  Go ahead.

ATTY        Okay.

BY ATTORNEY:

Q       All right.  You said the low back and the left hip.  Do you have any difficulty with your legs?

A       My left leg.

Q       Okay.  And tell me what happens to your left leg?

A       I get pain all the way down through it.  And I do that, I can't, I can't work it right. It won't - - And like walking and standing, I can't stand it.

Q       Okay.  And then you say you can't work it right.  Do you mean it's hard to control the movement of it, or - -

A       Yeah.

Q       Does it - -

A       Yes.

Q       If it gets like that, can you bear weight on it?

A       A little bit of weight.  Yes.

Q       Okay.

A       But I don't walk with any cane or anything though.

Q       Uh-huh.  Okay.  So tell me, is the pain in your leg any different from the pain in your back?  Is it the same kind of pain?

A       It's the same kind of pain.  It's sharp.

Q       A sharp - -

A       A sharp pain.

Q       Okay.  And do you have any numbness or tingling in either of your legs or any

part of you?

A       No.

Q       Okay.  Have you had any difficulty with your right leg?

A       No.

Q       All right.  Now, are you on medication for the pain?

A       Yes.

Q       Do you know - -

A       Maybe - - that's about the only medication.

Q       And do you know the name of your medicine?

A       No.

Q       Do you - - how often do you take it?

A       Twice a day.

Q       Is this the kind of medicine that you can get addicted to or not?  If you know?

A       I don't really know.

Q       You don't really know.

A       I don't really know.

Q       All right.  Have you had any shots in your back?

A       No, other than that one that Weinstein maybe - - well, Debby gave me a pain shot

the last time I was in to see her.  Well, the first time I went to see her, I think, she gave me a pain

shot.

Q    Okay.  And then after than, you've been on the prescribed medication?

A    Yes.

Q    Okay.  You've indicated you have difficulty with various positions?  So I'm going to just ask you right now about some of that.  Approximately as a rule, how long can you sit before you need to get up and move around?

A    Ball park figure about 15, 20 minutes, something like that.

Q    When you have to get up, what is the reason that, that makes you need to get up?

A    My back goes to hurting worse.

Q    All right.  What about standing?  Now, think about maybe going to the grocery store, standing out - - standing in the checkout line or maybe if you cook, standing at the stove, something like that.  About how long can you stand before you need to get off your feet?  That's - -

A    A ball park, that's 25, maybe 30 minutes.

Q    Okay.  Now, it sounds to me from your answer that maybe standing is somewhat easier for you than sitting?

A    Yes.

Q    Is it?

A    Uh-huh.

Q    Okay.  What about walking?  Now if you set out walking on level ground and you're not in a hurry.  Approximately how long or how far do you think you could walk before you need to get off your feet?

A      Well, approximately about 500 feet.

Q      Okay.  Is there - - are you thinking of something specific that's about 500 feet away that you know you can walk to?

A      Yes.  From my house to my father's.

Q      Okay.  And approximately how often do you do that?

A      About one time a day.

Q      Okay.  And let me ask you about lifting and carrying.  Are you limited in what you can lift and carry on a regular basis without hurting yourself?

A      Yes.  Yes.

Q      Okay.  Approximately how much can you lift and carry on a regular basis without - - excuse me - - causing yourself any extra pain or strain?

A      Approximately 10, 15 pounds.

Q      Are you thinking of something that weighs 10 or 15 pounds that, that you know that you're aren't able to handle?

A      Yeah.  Like my pop that I buy from the store.

Q      Okay.  What, what size pop do you buy or in what - -

A      The 12-packs.

Q      The 12-packs?

A      Uh-huh.

Q      Okay.  How much pop do you drink?   That's a little off the subject, but I'll ask it now?

A      Well, usually probably seven to eight cans - -

Q Per day?

A - - approximately.

Q What kind of pop do you drink?

A Pepsi for years.

Q It might relate. Yeah. Okay. All right. So as far as the positions that you get into. What are you most - - or what is your most comfortable position if you have one that's more comfortable than others?

A Lying down.

Q Tell me about that? When do you do it and how long?

A Usually I go to bed around 12:00, 1:00. And I'm usually up about no later than 8:00. I'm usually up and down all night long.

Q Why are you up and down?

A A pain in my back.

Q Okay. What about daytime?

A Daytime, it just varies. I go from sitting to standing, walking around. And lying down sometimes.

Q Approximately when you lie down, approximately how long do you lie there in the day time, if you know?

A Oh about 25, 30 minutes. I usually catch a little cat nap during the day.

Q Okay.

A This happens all day.

Q Okay. Well, now, do you deliberately go to sleep or do you just - -

A        I just drift off.

Q        You just drift off?

A        Yes, ma'am.

Q        Are you on any particular medicine that, that makes you drowsy or sleepy, or are you just maybe tired from the night before?

A        Nothing that I know of.  I'm just mainly tired from the night before.

Q        Now, if you, if you could separate it out.  Now, I know it's not the same all the time.  So just, you know, give me your best at it.   Now, if you're looking at just a normal day, how much of the time are you up on your feet, either standing or walking around, as opposed to just sitting down in a normal position?  As opposed to lying down or in some position other than just sitting straight up?

A        Well, if all I do is standing probably no more than two hours, maybe three.

Q        Okay.  How about sitting?  When you sit, do you sit in a normal chair?  I mean you don't have any - -

A        I sit on the couch.

Q        Okay.  But you're sitting with your, your feet on the floor and your back straight?

A        Yes.

Q        Normal sitting - -

A        Yes.

Q        - - position?  Okay.  Approximately how much time in a normal day would you say you spend doing that?

A        In that part, probably, probably a couple of hours.

Q        Okay.  What's happening the rest of the time?

A        The rest of the time I'm either up walking or lying down.

Q        Is, is - - has this been going on approximately like this since you have been unable to work?

A        Yeah.  It's been going on for the last year.

Q        Okay.  Now, on a scale from zero to 10, now zero is no pain, and 10 is bad enough where you - - that's probably when maybe Debby gave you a shot.  Okay.  Could you use from zero to 10 to tell me what happens to your pain during a normal day?  I mean what's it, what's it's best and what's it's worst?

A        At best it would probably would go to a four.

Q        Okay.

A        And at worst I'd say eight to nine.

Q        Okay.  Is there any particular time of the day or any - - is there any pattern to when your when gets worse?

A        No.  No.  It just gets awful with - -

Q        Okay.  Now, if you're varying your positions the way you described, does that - -

A        Uh-huh.

Q        - - have any an impact on your pain?

A        It helps it some.  Yes.

Q        All right.  Now, looking at some other things that are wrong with you or that you may have had medical treatment for.  You told us about your hip.  Is - - do, do your doctors tell you whether any of the pain that you're having - - excuse me - - having now, has anything to do

with your hip?  Or do they suspect that it - -

A  The Dr. Lore told me last week that it was probably on account of this.  My hip and my back.

Q  Right.  Is he talking about getting any kind of an MRI on your hip or does he feel that the x-rays tell him all he needs to know about what's going on with your hip at present?

A  He just feels the x-rays tell him what's wrong - -

Q  Now that he can see - -

A  - - with it.

Q  Okay.  Has it gone out of place anymore?

A  Yes.  He tried to put it back in place when I seen him last week.

Q  Okay.  So he's saying that the hip is just not seeded in the joint quite the way it's supposed to be?

A  Yes.

Q  Is that like a - - I mean that happens a lot or does it - -

A  Yeah.

Q  - - stay that way?

A  He, he can't, he can't keep it in.

Q  Okay.  Have you noticed whether there's any, any movement that you make or anything that you do that has any impact on that hip joint?

A  And just any kind of movement will, at times, will jump it out.

Q  Okay.  So for no real reason, it just comes out?

A  Yes.

Q     When you move it.

A     I've been, I've been sneezing and jump it out.

Q     Okay.  Now, is there any associate - - in other words, can you tell when it's coming out?

A     Yes.

Q     Okay.  Tell me how do you know?

A     The pain gets worse through my hip.

Q     Okay.  So you can actually more or less feel that it's out of place?

A     Yes.

                    *                    *                    *

Q     Okay.  All right.  Now, you mentioned that you were taking some, some medication for your nerves.  What kind of medication are you taking for your nerves?

A     Wellbutrin.

Q     And approximately how long have you been on that medication?

A     Six, eight months.

Q     Okay.  And who ordered that for you?

A     Debby.

Q     Okay.  And was there - - do you know why she put you on the Wellbutrin?

A     I was having trouble out of my nerves.  I was shaky and have - - things would scare me this year.

Q     Okay.

A     And I talked to her about it.  She put me on Wellbutrin.  She said it seemed to her

22

it was more depression than any thing else.

Q        In other words, when you told her what your problems were, she thought that you were having depression?

A        Yeah.

Q        Okay.  Has the Wellbutrin helped you?

A        Yes.

Q        Okay.  Tell me what's improved since you've been on the Wellbutrin?

A        My nerves, they don't - - things don't scare me like they used to.

Q        Okay.  Were you doing anything back then like crying?

A        Oh, no.

Q        No, you weren't crying?

A        No.

Q        When, when you got scared, what - - you said shaking.  Is that something that if I were standing next to you, I could see you shake?

A        Yes.  But - -

Q        Or is that something - - okay.

A        Yes.

Q        So you were physically shaking?

A        Yes.

Q        Okay.  Anything else that you think caused her to put you on that?

A        No.  It's - - that's why she put me on it.

Q        Okay.  Has your medication been adjusted in any way since you went on it?

A      No. She - -

Q      Have you gone up - - kept you on the same for - -

A      - - put me on the same for them and she's kept me there.

Q      Okay. All right. Well, I'm not going to ask you any more about that, because I know you've - - well, well, I'll, I'll ask you this. You did go to a psychological services that we sent you to?

A      Yes.

Q      And that was fairly recently. Do you do your best to be frank and honest with them and do - -

A      Yes.

Q      - - just what they asked you to do?

A      Yes.

E.      <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Takes care of four cats. (Tr. 161)

- Able to care for personal needs and grooming. (Tr. 162)

- Prepares food, including potatoes, eggs, bacon, and soups. (Tr. 162)

- Pays bills, washes dishes, takes out the trash. (Tr. 162)

- Shops for 30 minutes per week for food, medication, and other items. (Tr. 163)

- Watches television for three hours per day. (Tr. 163)

- Listens to the radio.  (Tr. 163)

- Visits with family during the week: sister-in-law and father visit daily, and sister-in-law and her family visit twice per week.  (Tr. 164)

- Leaves house twice per day to go to the doctor's office, visit family, or go to the store. (Tr. 164)

- Does not have any problems getting along with other people.  (Tr. 165)

- Unable to concentrate for long periods of time.  (Tr. 165)

- Goes deer hunting.  (Tr. 501)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant alleges the ALJ 1) erred in determining his physical RFC; 2) erred in determining and expressing his mental RFC; and 3) gave an improper hypothetical to the Vocational Expert ["VE"]. Commissioner contends the ALJ's determination of Claimant's physical and mental RFC is supported by substantial evidence.  Commissioner did not directly address Claimant's third allegation.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not

have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

        1.    Whether the ALJ Erred in Determining Claimant's Physical RFC.

        Claimant alleges the ALJ's conclusion he could perform medium work is not supported by substantial evidence. More specifically, Claimant alleges the ALJ, in determining his RFC, assigned improper weight to the reports from Dr. Mace, his assistant Debbie Cutlip, chiropractor Lohr, and physical therapist Kathy Bucks. Commissioner contends the ALJ's determination of Claimant's RFC is supported by substantial evidence, and that the ALJ properly considered and weighed the above reports.

        The ALJ in the present case concluded Claimant retained the ability to perform "medium work except cannot climb ladders, ropes or scaffolds; should not be exposed to temperature extremes; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others." (Tr. 22). In determining Claimant's RFC, the ALJ considered, and primarily relied on, the physical RFC assessments completed by Dr. Lauderman in June 2004 and Dr. Osborne in August 2004 wherein both doctors found Claimant could perform a full range of medium work, and that Claimant's allegations of pain were not entirely credible. (Tr. 23, 209, 249). The ALJ also considered Claimant's allegations of pain and limitation, and found Claimant was not entirely credible. (Tr. 23). Finally, the ALJ considered the reports from Dr. Mace, his assistant

28

Ms. Cutlip, chiropractor Mr. Lohr, and physical therapist Ms. Bucks, and concluded the reports, for different reasons, were entitled to less weight.

The Court finds the ALJ's conclusion Claimant could perform medium work is supported by substantial evidence, namely Drs. Lauderman's and Osborne's reports (see 20 C.F.R. § 1527(f), establishing the ALJ may consider opinions of non-examining sources); Dr. Sabio's report dated May 2004 (Tr. 213); the EMG/NCV report dated October 2004 (Tr. 264); Dr. Kazi's report dated April 2004 (Tr. 300); and Claimant's retained ability to deer hunt, take care of his cats, prepare meals, shop, and take out the trash. (Tr. 161-165, 501).

The Court next finds the ALJ properly considered the reports from Dr. Mace, his assistant Ms. Cutlip, chiropractor Mr. Lohr, and physical therapist Ms. Bucks.

Debbie Cutlip, PA-C

Ms. Cutlip, assistant to Dr. Mace, treated Claimant at Webster Memorial County Hospital. On July 2004 and July 2005, Ms. Cutlip completed a Physical Examination report. (Tr. 247, 493). In her July 2004 report, Ms. Cutlip concluded Claimant could not work, should avoid heavy lifting, sitting, and standing, and would remain disabled for a year. (Tr. 247). In her July 2005 report, Ms. Cutlip concluded Claimant could not perform his customary occupation, could perform other full time work "probably sitting at a desk with retraining," should avoid "lifting, ___, prolonged sitting, standing," and would be unable to work full time for a year. (Tr. 493). The ALJ considered Ms. Cutlip's first report and concluded "not only is PA Cutlip not an acceptable medical source, the assessment is not supported by the objective medical evidence of record . . . ." (Tr. 24). The ALJ considered Ms. Cutlip's second report and concluded that while it had more support than the prior assessment, "it is still given little weight

since it also lacks objective support in the longitudinal medical evidence [] and appears to be based primarily upon the claimant's subjective symptoms that are not entirely credible." (Tr. 25). The Court finds the ALJ's treatment of Ms. Cutlip's reports was proper. Had the ALJ dismissed the first report solely because Ms. Cutlip was a physician's assistant or because she provided an opinion on an issue reserved to the Commissioner, his dismissal would have been in error. See 20 C.F.R.§§ 1513, SSR 96-5p. The ALJ's dismissal was not erroneous, however, because the ALJ dismissed both Ms. Cutlip's reports only after considering them within the context of the entire record, particularly Claimant's lifestyle evidence, evidence of Claimant's credibility, and the EMG/NCV study dated October 2004. (Tr. 24). Accordingly, Claimant's allegation the ALJ erroneously dismissed Ms. Cutlip's report is without merit.

Dr. Mace

Dr. Mace's sole report in the record is his signature on the "General Physical" report completed by Ms. Cutlip in July 2004. As explained above, the ALJ's treatment of that report was proper.


W.D. Lohr, D.C.

Chiropractor Lohr treated Claimant from May 2002 through March 2005. In March 2004, Mr. Lohr completed a Return to Work Recommendation and indicated Claimant should be limited to light work. (Tr. 207). In March 2005, Mr. Lohr completed a RFC assessment and concluded Claimant was limited to sedentary work. (Tr. 308). The ALJ considered Mr. Lohr's reports and discredited them because "chiropractors not acceptable medical sources," and because the reports were not supported by objective evidence in the record. As stated above in

relation to Ms. Cutlip's reports, had the ALJ dismissed Mr. Lohr's reports solely because Mr. Lohr was a chiropractor, his dismissal would have been in error. See 20 C.F.R.§§ 1513. The ALJ's dismissal of the reports was not erroneous, however, because the ALJ's dismissal was the result of consideration of the reports within the context of the entire record. For example, the ALJ relied on the inconsistency between Mr. Lohr's assignment of a *reduced* RFC from 2004 to 2005, and Ms. Cutlip's assignment of an *increased* RFC from 2004 to 2005. (Tr. 25). Furthermore, Mr. Lohr's reports were not supported by the record as a whole, including Drs. Lauderman's and Osborne's reports, Dr. Sabio's report dated May 2004 (Tr. 213), the EMG/NCV report dated October 2004 (Tr. 264), Dr. Kazi's report dated April 2004 (Tr. 300), and Claimant's lifestyle evidence. (Tr. 161-165, 501). For these reasons, Claimant's allegation the ALJ erroneously dismissed Mr. Lohr's reports is without merit.

Kathy Bucks, P.T.

Ms. Bucks completed a Functional Capacity Evaluation in January 2002 (Tr. 372). She noted Claimant "presented limited mobility and strength throughout the exam . . . Extremity mobility and strength are within functional limits . . . His general movement pattern is synergistic and fluid . . . Gait is without limp short distances. His gait progresses to a mild limp after 500 feet distance." (Tr. 372). Ms. Bucks concluded Claimant could lift 15 pounds occasionally, 7 pounds frequently, and negligible pounds constantly or unlimited. (Id.) She also noted Claimant's representation that "he feels he could complete the job duties of warehouse at his pre-injury." (Id.). The ALJ considered Ms. Bucks' report, relying on Ms. Bucks' conclusion Claimant could return to work. (Tr. 24). Contrary to Claimant's allegation, there is no evidence the ALJ dismissed Ms. Bucks' report because it was from an "improper source," or otherwise

improperly evaluated Ms. Bucks' report.

For the above reasons, Claimant's assertions do not warrant relief.

2.     <u>Whether the ALJ Erred in Determining and Expressing Claimant's Mental RFC</u>.

Claimant alleges the ALJ i) erred in determining his mental RFC because he erroneously disregarded Ms. Hagan's report, and ii) erred in expressing his mental RFC because he failed to set out Claimant's mental RFC in terms of work-related functions, as opposed to vocational categories. Commissioner argues the ALJ properly weighed Ms. Hagan's report, and correctly expressed Claimant's mental RFC.

i.     <u>Ms. Hagan's Reports</u>

In March 2005, Claimant was sent by counsel to Ms. Hagan. Ms. Hagan completed a psychological evaluation of Claimant and diagnosed Claimant with depressive disorder and anxiety disorder, borderline intellectual functioning, and assigned Claimant a GAF of 51. (Tr. 337). Ms. Hagan concluded,

> "Claimant should be referred to a psychiatrist to assess the need for medications. He should also obtain counseling to address his depressive and anxious conditions. Clinicians may find an instructional approach more beneficial than an insight oriented approach. He should be referred to a pain treatment clinic to learn new coping skills to deal with chronic pain."

(Tr. 337). Ms. Hagan also completed a mental RFC assessment wherein she concluded Claimant had mild to moderate mental work-related limitations. (Tr. 345). Finally, Ms. Hagan completed a Psychiatric Review Technique Form (PRTF) and found Claimant's affective disorder posed a mild restriction on activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and gave rise to one to two episodes of decompensation, each of extended duration. (Tr. 351). The ALJ considered Ms. Hagan's reports. He gave "some weight" to the PRTF, but largely discredited Ms. Hagan's

32

opinions, finding the record did not support Ms. Hagan's opinion Claimant had a GAF of 51, experienced one to two episodes of decompensation, and was disabled since 1999. (Tr. 22, 26). Despite his discredit of Ms. Hagan's opinions, the ALJ gave Claimant the benefit of the doubt and found his mental impairments were severe and restricted Claimant's RFC to reflect those impairments. (Tr. 26).

For the following reasons, the Court finds the ALJ's treatment of Ms. Hagan's report is supported by substantial evidence. First, while Ms. Hagan found Claimant had a GAF of 51, Dr. Urick, in February 2006, found Claimant had a GAF of 65. Dr. Urick's assigned GAF of 65 more accurately reflects Claimant's lifestyle evidence, including his ability to care for his cats, cook, clean, socialize with family, and get along with others. (Tr. 161-65). Second, although Claimant was diagnosed in April, May, August, and September 2004 with depression by the attending physician at Webster County Memorial Hospital, (Tr. 231-32, 270-72), the record is void of any additional mental health treatment or counseling sought by Claimant. Third, Ms. Hagan's statement Claimant's disabling mental impairments existed from December 1999 to the date of the examination is contradicted by the fact Claimant worked from June 2000 to January 2004, with a break in May 2001. (Tr. 149). For these reasons, the Court finds the ALJ's treatment of Ms. Hagan's reports was proper.

    ii.    <u>ALJ's Error in Expressing Claimant's Mental RFC</u>

As stated above, Claimant alleges the ALJ erred in expressing his mental RFC because he failed to express his mental RFC in terms of work-related functions, as opposed to vocational categories (such as "medium work"). Claimant's allegation relies on SSR 96-8p, which provides a claimant's nonexertional capacity must be expressed in terms of work-related functions. Such

work-related functions generally include the ability to "understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p. Claimant also directs the Court's attention to an Order[5] from the Appeals Council in an unrelated case wherein the Council concluded the ALJ failed to comply with SSR 96-8p. Specifically, the Appeals Council found the ALJ's statement that Claimant's mental difficulties "would cause the Claimant to be limited to unskilled work" inadequately described Claimant's ability to do specific, work-related functions.

The Court finds the ALJ in the present case complied with SSR 96-8p. In expressing Claimant's mental RFC, the ALJ wrote Claimant 1) "should work in a low stress environment with no production line type of pace or independent decision making responsibilities," 2) "is limited to unskilled work involving only routine and repetitive instructions and tasks," and 3) "should have no more than occasional interaction with others." (Tr. 22). Contrary to Claimant's assertion, the above description of Claimant's RFC does not merely classify Claimant as fitting into a specific vocational category; it details Claimant's mental RFC in terms of specific work-related functions. Claimant's allegation is therefore without merit and does not warrant relief.

3.    Whether the ALJ Posed an Improper Hypothetical to the VE.

Claimant alleges in his brief, "It follows from Arguments 1 and 2 that the ALJ made his decision on the basis of an inadequate hypothetical question to the vocational expert in violation of circuit law." Commissioner did not directly address Claimant's allegation.

Claimant's argument presupposes the Court found his first and second arguments

---

[5] See Doc. No. 12.

meritorious.  The Court did not find them meritorious.  Claimant's present argument therefore fails.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because 1) the ALJ's determination of Claimant's physical RFC is supported by substantial evidence; 2) the ALJ's treatment of Dr. Mace's, Ms. Cutlip's, Mr. Lohr's, and Ms. Bucks' reports was proper and supported by substantial evidence; 3) the ALJ's treatment of Ms. Hagan's report is supported by substantial evidence; and 4) the ALJ complied with SSR 96-8p.

2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

## V.  Claimant's Motion to Supplement the Record with Lost Document

Claimant filed a Motion to Supplement the Record with Lost Document.  Commissioner did not address Claimant's Motion.  The document at issue is a decision by the Appeals Council in an unrelated case.  Claimant represents the document was sent to and received by the Appeals Council in July 26, 2006, and erroneously omitted from the administrative record.  An Order from the Appeals Council dated March 16, 2007, (Tr. 14), reveals the Appeals Council received the document.  The document does not appear in the administrative record.  The Court therefore Orders Claimant's Motion to Supplement the Record with Lost Document be **<u>GRANTED</u>**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation and Order, file with the Clerk of the Court written objections identifying the portions of the Report and

Recommendation and Order to which objection is made, and the basis for such objection. A

copy of such objections should be submitted to the District Court Judge of Record. Failure to

timely file objections to the Report and Recommendation set forth above will result in waiver of

the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 18, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE