IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RANDALL L. COWGAR,

        Plaintiff,

v.                         CIVIL ACTION NO. 1:07CV59
                                (Judge Keeley)

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on May 1, 2007, the Court referred this Social Security action to United States Magistrate James E. Seibert with directions to submit proposed findings of fact and a recommendation for disposition. On July 18, 2008, Magistrate Seibert filed his Report and Recommendation ("R&R") and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the R&R.

On July 27, 2008, plaintiff, Randall L. Cowgar, ("Cowgar") through counsel, Joyce H. Morton and Montie VanNostrant, filed objections to the Magistrate's R&R. On August 1, 2008, counsel for

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

the Commissioner filed a response to the objections, stating that Cowgar's objections "revisit issues raised in Plaintiff's brief" and requesting that, following a <u>de novo</u> review, the Court adopt Magistrate Judge Seibert's R&R.

## I.  PROCEDURAL BACKGROUND

On March 16, 2004, Cowgar filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging disability since January 30, 2004 due to back and hip injuries. On June 18, 2004, the Commissioner denied the application initially and, on August 24, 2004, again denied the application on reconsideration. On February 23, 2006, following hearings on March 23, 2005 and January 26, 2006, the Administrative Law Judge ("ALJ") denied Cowgar's application for benefits. The Appeals Council then denied Cowgar's request for review. On May 1, 2007, Cowgar filed this action seeking review of the February 23, 2006 final decision.

## II.  PLAINTIFF'S BACKGROUND

On March 23, 2205, the date of the first hearing, Cowgar was 37 years old and was 38 years old on January 26, 2006, the date of the second hearing. He has an eighth grade education and prior work experience as a timber cutter and skidder.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

### III.   ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found as follows:

1.   Cowgar meets the insured status requirements of the Social Security Act through December 2008;

2.   Cowgar has not engaged in substantial gainful activity at any time relevant to the decision;

3.   During the period under adjudication, Cowgar had the following combination of severe impairments: degenerative disc disease/degenerative arthritis/chronic strain/sprain of the lumbosacral spine; chronic strain of the left hip; depressive disorder not otherwise specified ("NOS"); anxiety disorder NOS; and borderline intellectual functioning (Regulations (20 CFR §§ 404.1520(c) and 416.920(c)). His impairments, considered alone or in combination, do not meet or equal one of the listed impairment in 20 CFR Part 404, subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

5.   Cowgar has the residual functional capacity to perform medium work that involves no climbing ladders, ropes or scaffolds, no exposure to temperature extremes, is in a low stress environment with no production line type of pace or independent decision making responsibilities, involves limited to unskilled work with only routine and repetitive instructions and tasks, and has no more than occasional interaction with others;

6.   Cowgar is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7.   Cowgar was born on July 30, 1967, was 36 years old at the time of the alleged disability onset date and was 38

years old on the date of the decision. He is considered a younger individual pursuant to 20 CFR 404.1563 and 416.963;

8.  Cowgar has a limited eighth grade education and is able to communicate in English (20 CFR 404.1564 and 416.964);

9.  Transferability of job skills is not material to the determination of disability due to Cowgar's age (20 CFR 404.1568 and 416.969);

10. Considering Cowgar's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966); and

11. Cowgar has not been under a "disability," as defined in the Social Security Act, from January 30, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g).

## IV.  __PLAINTIFF'S OBJECTIONS__

On July 27, 2008, Cowgar filed objections to the R&R. He contends that the Magistrate Judge erred in determining that the record contained substantial evidence to support the ALJ's (1) residual functional capacity ("RFC") finding regarding his review and assignment of weight with respect to the reports from Cowgar's treating physicians, Dr. Mace, Ms. Cutlip, and Dr. Lohr, (2) the mental RFC with respect to the ALJ's analysis of the psychological reports of Cynthia Hagan, and (3) failure to comply with SSR 96-8p

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

regarding the hypothetical question to the vocational expert ("VE").

## V.  <u>MEDICAL EVIDENCE</u>

The evidence of record included the following relevant medical history.

1.  A January 4, 2002 Functional Capacity Evaluation, from Kathy Bucks, P.T., indicating:

> Assessment: This client was friendly and cooperative throughout the exam.  He appeared to put forth reasonable effort.  He presented limited mobility and strength throughout the exam.  Extremity mobility and strength are within functional limits. His general movement pattern is synergistic and fluid.  Gait is without limp short distances. His gait progresses to a mild limp after 500 feet distance.

> Based upon client's performance today, Mr. Cowger would be placed in a physical demand level (PDL). This suggests that he is currently able to lift 15 pounds occasionally (1-32 reps/day every 15 minutes), 7 pounds frequently (33-200 reps/day or every 3 minutes) and negligible pounds constantly or unlimited (greater than 200 reps/day) within his current limit of tolerance.

> . . .

> According to case manager Lori Hager, this client's employer has indicated that he is willing to accommodate any job modification needed.  Mr. Cowger states that he feels he could complete the job duties of warehouse at his pre-injury.

2.  A March 3, 2004 Attending Physician's Disability Certification, Return to Work Recommendations report from W. D. Lohr, D.C., indicating:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

I am the attending physician for the patient named above.

To avoid aggravation to his condition, I recommend the following:

Patient may return to work with the degree of work and limitations indicated:
Degree:

Light work. Lifting 20 pounds maximum with frequent lifting and/or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be only a negligible amount, a job is in this category when it requires walking or standing to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling or arm and/or leg controls.

Limitations:

In an 8 hour work day patient may stand/walk 4-6 hours; sit 1-3 hours; and drive 1-3 hours.

Patient may use hands for repetitive single grasping, pushing and pulling, and fine manipulation.

Patient may use feet for repetitive movements in operating foot controls: No

Patient is able to bend occasionally; squat frequently; climb occasionally.

Other instructions and/or limitations:

Light work restrictions are permanent at this point in time.

3.   An April 5, 2004 Tri State Occupational Medicine report from  Dr. Kazi, M.D. to Workers Compensation indicating a normal, steady gait, no assistance device, full range of motion of the hips, knees and ankles bilaterally, straight leg raising 60 degrees

in sitting position on the right and left, straight leg raising in supine position is 50 degrees on the right and left, lumbar flexion angle is 30 degrees and extension is 10 degrees, right and left lateral flexion is 20 degrees, sacral flexion angle is 20 degrees and sacral extension angle is 10 degrees.

Dr. Kazi's summary indicates:

The claimant is a 36-year old man who developed lower back pain on May 11, 2001 while working as a logger. He has been seeing a chiropractor and has been having chiropractic therapy since then. He also takes nonsteroidal antiinflammatory medications for his pain. He has been referred to a neurosurgeon who has not recommended surgery. He also underwent physical therapy.

On today's examination, there were range of motion abnormalities of the lumbar spine.

1) The claimant has reached maximum medical improvement. No further medical or surgical intervention will change his condition.

2) The claimant is currently not working.  He should be referred to a work conditioning and work hardening program, so that he may be sent back to work. His physician may also prescribe Neurontin, amitriptyline or Topamax for his lower back pain.  He may also benefit from an antidepressant, which would most probably improve his lower back pain.

3) The following impairment rating is recommended.

Regarding the lumbar spine injury, then from Table 75, page 113, of the Guides to the Evaluation of Permanent Impairment, Fourth Edition by the American Medical Association, the claimant does not fall into any category. Therefore, no impairment rating is given from this table. Lumbar range of motion tests do not meet validity criteria, as the tightest straight let raising test, which is 50 degrees, exceeds the sum of sacral

flexion and extension, which is 30 degrees, by more than 15 degrees. An impairment rating for lumbar flexion and extension cannot be given according to page 127 of the Guides. From Table 82, page 130, of the Guides, the claimant receives one percent impairment of the whole person for range of motion abnormalities in lumbar right lateral flexion and one percent impairment of the whole person for range of motion abnormalities in lumbar left lateral flexion. The impairment ratings for range of motion abnormalities in the lumbar spine are added for a total of two percent impairment of the whole person.

4.    A May 5, 2004 Webster County Memorial Hospital Clinic Record from attending physician indicating complaints of increased depression due to chronic pain, inability to sleep due to pain and heartburn. The doctor gave him samples of Wellbutrin;

5.    A May 19, 2004 Webster County Memorial Hospital Clinic Record from attending physician (illegible name) indicating complaints of depression due to chronic pain, HTN, GERD. Medications were continued and he was given samples of Wellbutrin;

6.    A May 27, 2004 x-ray report from Dean Ball, D.O. indicating frontal and lateral views of the lumbar spine revealed no fracture or destructive process, marked narrowing involving the L5-S1 intervertebral discs, remaining intervertebral discs are of normal height and mild degenerative changes involving the upper lumbar spine;

7.    A May 31, 2004 West Virginia Disability Determination Service report from Dr. Sabio, M.D. indicating complaints of hypertension, low back pain, and left hip pain, tenderness over the left hip, no redness, swelling, or effusion in any of the joints of the upper and lower extremities, no Heberden's nodes, rheumatoid nodules or Bouchard's nodes, no edema or cyanosis, normal spinal curvature, tenderness over the spinal processes of the lumbar spine, no kyphosis or scoliosis, and tenderness over the sacroiliac joints on both sides. A diagnostic impression of Hypertension, chronic back strain and chronic left hip strain;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

8.    A June 7, 2004 Physical Residual Functional Capacity
Assessment from Thomas Lauderman, D.O, indicating Cowgar could
occasionally lift and/or carry 50 pounds, frequently lift and/or
carry 25 pounds, stand and/or walk about 6 hours in an 8-hour
workday, sit about 6 hours in an 8 hour workday, push and/or pull –
unlimited, other than as shown for lift and/or carry, no postural,
manipulative, visual, communicative or environmental limitations.

Lauderman also indicated that:

Clmt alleges back and hip pain syndrome along with HTN.
Clmt takes ansaids for pain. Clmt states he still hunts,
swims, paints, fishes, woodworking, watering, etc.
depending on how he feels. Credibility is an issue. Clmt
states under activities and interests he watches TV about
three hours per day and listens to radio. RFC is
decreased – pain and fatigue considered.

9.    A July 26, 2004 Webster County Memorial Hospital Clinic
Record from Cowgar's attending physician (illegible name)
indicating complaint of back pain  and recommending a repeat MRI;

10.    A July 26, 2004 West Virginia Department of Health and
Human Resources, Physical Examination from Debbie Cutlip, PAC,
indicating complaints of persistent sharp pain with burning into
left leg, muskuloskeletal back pain, and ulnar nerve compression.
Cowgar reported inability to work because he cannot lift, sit or
stand for prolonged periods of time. Cutlip recommended testing,
including MRI of the low back, EMG right upper extremity,
consultation with a neurosurgeon and vocational rehabilitation;

11.    An August 3, 2004 Disability/Incapacity Evaluation
indicating the material submitted was sufficient to permit a
determination that client is disabled SSI-Related Medicaid Age 18
or over, client was not currently performing substantial gainful
activity, client  has a medically determinable impairment or
combination of impairments which significantly limit ability to
perform basic work activity, that client's impairments meet or
equal the listing of impairment and that the case must be
reevaluated on 7/05 unless an earlier evaluation becomes necessary;

12.   An August 9, 2004 Attending Physician, Webster County Memorial Hospital Clinic Record indicating a diagnosis of HTN, GERD, and depression. The record further indicates that "as long as he takes his medicine, he does well;"

13.   An August 12, 2004 Physical Residual Functional Capacity Assessment from Cynthia Osborne, D.O., indicating ability to occasionally lift and/or carry- 50 pounds, frequently lift and/or carry - 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8 hour workday, unlimited ability to push and/or pull other than as shown for lift and/or carry, no postural, manipulative, visual, communicative or environmental limitations. He complained of back pain with some decreased ROM but no focal neuro deficits. Osborne stated that

> Clmt appears to be credible, although symptoms are exaggerated. Clmt has c/o back pain with some decrease ROM but no but no focal neuro deficits. There is tenderness in the left hip and the SI joints. Gait is normal. Able to heel, toe, and tandem walk as well as squat. X-ray revealed some degenerative changes in 1-spine. Complaints seem out of proportion to expected. RFC set at medium;

14.   A September 13, 2004 Webster County Memorial Hospital Clinic Record from attending physician indicating a diagnosis of HTN well controlled with medication and depression improved with medication;

15.   An October 12, 2004 Webster County Memorial Hospital Clinic Record from attending physician indicating a diagnosis of back pain radiating into left buttock;

16.   An October 12, 2004 Webster County Memorial Hospital x-ray report from Dr. William Tan indicating an impression of 1) straightening of the lumbar curvature likely related to positioning or muscle spasm, 2) degenerative disco genic disease at the level of L5-S1 and minimal osteophytosis, narrowing of the intervertebral disk space at level L5-S1, no spondylolisthesis and no blastic or lytic lesions;

10

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

17.   An October 14, 2004 United Hospital Center, EG EMG report indicating 1) median motor and sensory studies were normal on the right side, 2) ulnar motor and sensory studies were normal on the right side. 3) electromyography was normal and was not supportive of the C5-T1 radiculopathy on the right side. Impression was normal study not supportive of carpal tunnel syndrome, ulnar neuropathy, or C5-T1 radiculopathy on the right side;

18.   An October 19, 2004 Braxton County Memorial Hospital MRI report indicating 1) mild subligamentous disc herniation L5-S1 central and right with associated degenerative change and 2) degenerative changes L1-2. No other abnormality noted;

19.   An October 26, 2004 Webster County Memorial Hospital Clinic Record from attending physician indicating a diagnosis of muskuloskeletal back pain, scoliosis, bilateral shoulder bursitis (rare) and recommendation for a pain clinic, injections in his shoulders and vocational training;

20.   A November 23, 2004 Webster County Memorial Hospital Clinic Record from attending physician indicating a diagnosis of chronic back pain and HTN that was fairly controlled with medication;

21.   A February 25, 2005 Webster County Memorial Hospital Clinic Record from attending physician indicating a diagnosis of C.P., HTN and muskoskeletal back pain;

22.   A March 11, 2005 Webster County Memorial Hospital Clinic Record indicating a diagnosis of HTN and muskoskeletal pain. Notation on record reflects that Cowgar reported that the chiropractor told him he had restrictions on his back and that he should try to get disability;

23.   A March 16, 2005 Residual Functional Capacity Assessment from William Lohr, D.C., indicating that he has been Cowgar's treating physician since May 11, 2002, that he last examined him on March 16, 2005, that Cowgar was capable of performing work activity that required sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds, that permitted him to

alternate positions frequently, that provided a sit/stand option that required sitting at one time for 30 minutes, standing at one time for 10 minutes, walking at one time for 30 minutes, that required infrequent climbing, kneeling, crouching, crawling, balancing, stooping, bending, occasional stretching, squatting and reaching, no exposure to jarring or vibrating machinery, cold or hot temperatures, fumes or dust, no pushing or pulling with legs. Lohr stated that Cowgar was not "capable of performing any full-time job, that is 8 hours per day, five days per week, on a sustained basis" and was only able to perform sedentary to light work load on an infrequent basis for short periods of time. He also indicated that "Cowgar suffers from injury to his low back which is permanent and progressive in nature, his prognosis would have to be considered poor;"

24. A March 17, 2005 Psychological Evaluation from Cynthia Hagan, MA, indicating a diagnostic impression of Axis I: 311 Depressive Disorder NOS, 300.00 Anxiety Disorder NOS, Axis II: V62.89 Borderline Intellectual Functioning, Axis III: Lower back pain that radiates throughout his lower extremities, numbness in lower extremities, shoulder pain and headaches, Axis IV: Economic Problem: low income, Vocational Problem: unemployed Axis V: 51.

In her summary, she indicated:

Mr. Cowger is a 37-year-old Caucasian male who was referred to assess his depressive and anxious symptoms. He is also applying for disability benefits. His cognitive functioning was measured within the Borderline range. His achievement scores in Spelling and Arithmetic were slightly lower than his ability level but commensurate. Mr. Cowger's personality profile indicates that he has much psychological distress and difficulty adjusting psychologically. Randall reported severe depressive thoughts and feelings at a substantially higher level than is seen in 97% of clients. He reports inconsolable sadness, melancholia, feeling of loss, a sense of helplessness, and perhaps some self-pity as well. He also reports a high level of physical symptoms, suggesting the presence of vegetative depression and autonomic anxiety. It should be noted that results

greatly differed from the BDI, in which Mr. Cowger reported a mild amount of depression. However, the Battery for Health Improvement is a more sophisticated instrument. On his BAI, he reports that he is experiencing a moderate amount of anxiety.

The following recommendations are made: Mr. Cowger should be referred to a psychiatrist to assess the need for medications. He should also obtain counseling to address his depressive and anxious conditions. Clinicians may find an instructional approach more beneficial than an insight-oriented approach. He should be referred to a pain treatment clinic to learn new coping skills to deal with chronic pain;

25. A March 25, 2005 West Virginia Department of Health and Human Resources General Physical report from Dr. Mace, M.D., Debbie Cutlip, PA-C, indicating a diagnosis of muskuloskeletal back pain with burning to left leg and chronic aching and ulnar nerve compression. Cutlip also indicated that Cowgar was not currently able to work full time because he could not lift, sit or stand for prolonged periods of time and that the expected duration of his inability to work was one year. She recommended further testing or treatment, a consultation with a neurosurgeon, and referral for vocation rehabilitation;

26. An April 4, 2005 Mental RFC Capacity Assessment from Cynthia Hagan, M.A., indicating moderate limitations in understanding, remembering, and carrying out instructions, understanding and remembering short, simple instructions, carrying out short, simple instructions, understanding and remembering detailed instructions, carrying out detailed instructions, exercising judgment or making simple work-related decisions, sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines, sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality, completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks, demonstrating reliability, ability to respond to changes in the work setting or work processes, setting realistic goals and

making plans independently of others, ability to tolerate ordinary work stress, mild limitation in social functioning in a normal competitive work environment, interacting appropriately with the public, responding appropriately to direction and criticism from supervisors, working in co-ordination with others without being unduly distracted by them, maintaining acceptable standards of courtesy and behavior, relating predictably in social situations in the workplace without exhibiting behavioral extremes, ability to be aware of normal hazards and take appropriate precautions, functioning independently in a competitive work-setting, carrying out an ordinary work routine without special supervision, traveling independently in unfamiliar places, and no limitation on ability to ask simple questions or request assistance from coworkers or supervisors;

27.   An April 4, 2005 Psychiatric Review Technique, from Cynthia Hagan, M.A., indicating "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Disorder 300.00 Anxiety DO NOS." She further indicated that Cowgar had mild limitation in restriction of daily living, mild limitation in difficulties in maintaining social functioning, moderate limitation in difficulties in maintaining concentration, persistence and pace, and one or two episodes of decompensation, each of extended duration;

28.   An April 12, 2005 Webster County Memorial Hospital Clinic Record indicating a diagnosis of HTN better controlled with medications, chronic back pain and "still waiting to go to the pain clinic";

29.   A May 31, 2005 Webster County Memorial Hospital Clinic Record indicating a diagnosis of HTN, back pain and noting that previous physical therapy did not help low back pain;

30.   A July 26, 2005 Webster County Memorial Hospital Clinic Record, indicating a diagnosis of muskoskeletal pain with left sciatica;

31.   A July 26, 2005 West Virginia Department of Health and Human Resources General Physical report from Debbie Cutlip, PAC, indicating a diagnosis of muskuloskeletal back pain with left

sciatica. She noted that Cowgar was not able to work full time at customary occupation or like work due to need to be able to frequently change positions, was able to perform other full time work sitting at a desk with retraining, and should avoid lifting, bending, prolonged sitting or standing. She estimated the duration of inability to work full time as one year and recommended an MRI, consultation with a neurosurgeon and vocational rehabilitation;

32. A November 3, 2005 Disability/Incapacity Evaluation, from Dr. Clark, M.D., indicating that Cowgar was disabled, was not currently performing substantial gainful activity, had a medically determinable impairment or combination of impairments which significantly limited his ability to perform basic work activity, that his impairment met or equaled a listing and that information submitted indicated that the case must be reevaluated in November 2006 unless the worker determines that the client needs an earlier evaluation;

33. A December 6, 2005 Seneca Health Services, Inc. Treatment Plan  indicting:

Summary of problems identified in assessment: Randall is experiencing anxiety which has exacerbated due to his inability to work.  Randall is experiencing mild phobia such as uncomfortable feelings that trucks will wreck into his home.  He lives near the road.

Individual therapy plan narrative: Randall will address his issues in therapy.

Problem List: 1) Anxiety, 2) Phobia's mild (to be addressed in therapy).

34, A December 2, 2005 Webster County Memorial Hospital Clinic Record indicating a diagnosis of HTN, back pain secondary to injury, depression. Record notes that the cold weather made his back hurt more but he was out deer hunting and that the Wellbutrin is not helping; and

35. A February 1, 2006 Seneca Health Services Psychiatric Evaluation from Dr. Lois Urick, M.D., indicating a diagnosis of

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Axis I: 300.00 Anxiety Disorder NOS, Axis II: V62.89 Borderline Intellectual Functioning (by prior psychological testing), Axis III: Diagnosis deferred - patient reports chronic hip and back pain, Axis IV: Problems with social environment, Axis V: GAF 65 and a fair prognosis.

Urick's evaluation noted as follows:

SOCIAL HISTORY:

The patient is the middle of three sons who were raised by the patient's biological parents until the patient's mother died of a heart attack when he was thirteen. He completed the eighth grade, but states that he left school after age sixteen to baby-sit for his younger brother, because his father needed help after his mother died. He states his grades were fair, although a psychological report notes that he did fail some classes. The patient was married for three years and they had no children; now divorced. He has been employed several times, but says the [sic] he is unemployed now and cannot work because of physical issues. When I asked if he felt that his anxiety affected his ability to work, he stated 'No.' He is applying for SSI on the basis of physical problems. He lives alone and reports that his father and two brothers are supportive. He states that he has no income and is not covered by medical insurance.

MSE: The patient is AOX4, exhibits good dress/grooming/hygiene, has good eye contact and no psychomotor abnormality. Manner is appropriate and polite. Affect is euthymic, mood "not too bad." Speech is WNL in rate, tone and content. Thoughts are goal-directed, and there is no evidence of delusional content. Attention, concentration and impulse control are intact, and sensorium is clear. Cognition appears intact and intelligence is estimated as slightly below average. Recent and remote memory appears grossly intact. The patient denies auditory and visual hallucinations, and lethal ideation. Insight is fairly good, judgment is good.

<u>Recommendations</u>: 1) In order to address anxiety, as the patient identifies as being somewhat distressing to him, we will try Paxil 20 mg qd; 2) The patient is encouraged to participate in supportive counseling; 3) Crisis intervention as appropriate; 4) RTC 1 month.

## VI.   <u>DISCUSSION</u>

### A.   <u>Applicable Regulatory provisions</u>

SSR 06-03p provides in pertinent part:

> The distinction between 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources' is necessary for three reasons. <u>First, we need evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment. . . . Second, only 'acceptable medical sources' can give us medical opinions. . . . Third, only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.</u>

> . . .

> In addition to evidence from 'acceptable medical sources' we may use evidence from 'other sources,' as defined in 20 C.F.R. 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

> • Medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, licensed clinical social

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

workers, naturopaths, chiropractors, audiologists, and therapists; . . .

Information from these other sources cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

. . .

Although the factors in 20 C.F.R. 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.' These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources,' such as teachers and school counselors who have seen the individual in their professional capacity. These factors include:

• How long the source has know and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s), and

• Any other factors that tend to support or refute the opinion.

(Emphasis added.)

Significantly, SSR 06-03p further provides:

The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, 'acceptable medical sources' 'are the most qualified health care professionals.' However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion for an 'acceptable medical source' including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

(Emphasis added.)

20 C.F.R. § 404.1527 states in pertinent part:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

opinion we receive.  Unless we give a treating
source's opinion controlling weight under
paragraph (d)(2) of this section, we consider
all of the following factors in deciding the
weight we give to any medical opinion

(1)      *Examining      relationship.*
Generally we give more weight to the
opinion of a source who has examined
you than to the opinion of a source
who has not examined you.

(2)      *Treatment      relationship.*
Generally, we give more weight to
opinions from your treating sources,
since these sources are likely to be
the medical professionals most able
to provide a detailed, longitudinal
picture     of     your     medical
impairment(s) and may bring a unique
perspective to the medical evidence
that cannot be obtained from the
objective medical findings alone or
from     reports     of     individual
examinations, such as consultative
examinations     or     brief
hospitalizations. <u>If we find that a
treating source's opinion on the
issue(s) of the nature and severity
of your impairment(s) is well
supported by medically acceptable
clinical and laboratory diagnostic
techniques and is not inconsistent
with the other substantial evidence
in [the] case record, we will give
it controlling weight.</u> When we do
not give the treating source's
opinion controlling weight, we apply
the factors listed in paragraphs
(d)(2)(I) and (d)(2)(ii) of this
section, as well as the factors in

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and

laboratory findings, the more weight we will
give that opinion. . . .

(4) *Consistency*.    Generally,    the    more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

20 C.F.R. § 404.1529 provides:

In determining whether you are disabled, we
consider all your symptoms, including pain,
and the extent to which your symptoms can
reasonably be accepted as consistent with the
objective medical evidence and other evidence.
By objective medical evidence we mean medical
signs and laboratory findings as defined in
§404.1528(b) and (c). By other evidence, we
mean the kinds of evidence described in
§§404.1512(b)(2)    through    (6)    and
404.1513(b)(1), (4), and (5) and (e). These
include statements or reports from your
treating    or    examining    physician    or
psychologist, and others about your medical
history, diagnosis, prescribed treatment,
daily activities, efforts to work and any
other evidence showing how your impairment(s)
and any related symptoms affect your ability
to work. We will consider all of your
statements about your symptoms, such as pain,
and any description you, your physician, your
psychologist, or other persons may provide
about how the symptoms affect your activities
of daily living and your ability to work.
However, statements about your pain or other
symptoms will not alone establish that you are
disabled; there must be medical signs and
laboratory findings which show that you have a
medical impairment(s) which could reasonably
be expected to produce the pain or the
symptoms alleged and which, when considered

> with all of the other evidence (including
> statements about the intensity and persistence
> of your pain or other symptoms which may
> reasonably be accepted as consistent with the
> medical signs and laboratory findings), would
> lead to a conclusion that you are disabled.

SSR 96-8p provides the definition for and the "policies and policy interpretations regarding the assessment of residual functional capacity." By definition,

> RFC is what an individual can still do despite
> his or her limitations. RFC is an
> administrative assessment of the extent to
> which an individual's medically determinable
> impairment(s), including any related symptoms,
> such as pain, may cause physical or mental
> limitations or restrictions that may affect
> his or her capacity to do work-related
> physical and mental activities. . . .
> Ordinarily, RFC is the individual's maximum
> remaining ability to do sustained work
> activities in an ordinary work setting on a
> **regular and continuing** basis, and the RFC
> assessment must include a discussion of the
> individual's abilities on that basis. A
> 'regular and continuing basis' means 8 hours a
> day, for 5 days a week, or an equivalent work
> schedule.
>
> . . .
>
> The RFC assessment must include a narrative
> discussion describing how the evidence
> supports each conclusion, citing specific
> medical facts (e.g., laboratory findings) and
> nonmedical evidence (e.g., daily activities,
> observations). The adjudicator must also
> explain how any material inconsistencies or

ambiguities in the evidence in the case record were considered and resolved.

## B.   Physical Residual Functional Capacity

Cowgar argues that the Magistrate Judge erred in his R&R in determining that the record contained substantial evidence to support the ALJ's residual functional capacity finding. In particular, he challenges the ALJ's review and assignment of weight regarding the reports of his treating health care providers, Drs. Mace and Lohr, and Dr. Mace's physician's assistant, Ms. Cutlip. Cowgar contends that the ALJ failed to follow SSR 06-03p, which provides that, pursuant to 20 C.F.R. 404.1527(d), an ALJ may consider and weigh opinions from "sources 'other' than acceptable medical sources."

Here, the ALJ determined:

> After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: he is able to perform medium work except cannot climb ladders, ropes or scaffolds; should not be exposed to temperature extremes; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

After analyzing all the factors for evaluating medical evidence, the ALJ further determined:

> The claimant was not entirely credible, based on some of his statements and other evidence in the record. He appears to be exaggerating his symptoms substantially in view of the objective medical evidence. He complained of severe pain at the hearing and on other occasions but has contradicted himself in this regard. His original back injury was apparently a compensable one that occurred sometime in May 2001, but he was able to return to work for two years. On July 31, 2002, the claimant reported at the Webster County Clinic where he receives his primary care that his back hurts 'from time to time.' On February 5, 2003, he stated that his back hurt but not often; on physical examination there was slight lumbar tenderness. On May 6, 2003, he reported that his back had improved and he had no complaints concerning his back. On February 4, 2004, the claimant reported that he had quit his job and was going to Fairmont to get another one. This indicates to the undersigned that the claimant felt he was able to perform some sort of work and indeed, on that date, there were no complaints concerning the claimant's back and no back diagnoses were made. Again on May 19, 2004, there were no back complaints, findings or diagnoses. The same was true on June 24, 2004. On August 9, 2004, the claimant reported that as long as he takes his medication he feels and does well. He reported that he was looking for a job but that no one would hire him due to his original back injury in 2001. Again, this does indicate to the Administrative Law Judge that the claimant felt he was able to perform some sort of work, which is supported

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

by the provider's treatment recommendation on October 25, 2004, that the claimant would benefit from vocational training, and in the welfare report on July 26, 2005, opining that the claimant was able to perform full time work. The claimant had no pain complaints on January 27, 2005, or on February 16, 2005. On April 12, 2005, the claimant reported at the Webster County clinic that his blood pressure was much better since starting the new medication and he had no pain complaints and no abnormal clinical signs were noted, although he was waiting to go to a pain clinic. On May 31, 2005, the claimant was urged to do exercises, indicating that the provider felt that the claimant was capable of physical activity and it was reported that the claimant had no radiculopathy. On August 29, 2005, the claimant reported that he was 'doing good' and no abnormal clinical signs were reported. In fact, the claimant was apparently doing so well that he went deer hunting according to the treatment report on December 2, 2005, although the cold weather had caused some back discomfort, but apparently not the deer hunting. As evident above and discussed in more detail below, the objective medical evidence of record does not support the pain and limitations to the extent alleged by the claimant.

1.   **Dr. Mace and PA Cutlip**

After reviewing all the evidence of record, the Magistrate Judge noted that the ALJ had assigned "little to no weight" to the notes from the Webster County Clinic ("the Clinic"). Debbie Cutlip ("Cutlip"), PA-C, a physician's assistant ("PA") at the Clinic,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

worked with Dr. Mace. The medical records from the Clinic establish that she saw and treated Cowgar during the majority of his visits to the Clinic.

As the basis for the little to no weight assigned to the Clinic's records, the ALJ explained that, because Cutlip is a physician's assistant, pursuant to the guidelines set forth in SSR 06-03p, she is not an acceptable medical source. He also found that her opinion that Cowgar's low back condition and ulnar nerve compression "would precluded [sic] any full time work for one year" was not supported by the objective medical evidence in the record. That medical evidence included an EMG/NCV study indicating no ulnar nerve compression and lumbar MRIs revealing only mild herniation at L5-S1 with degenerative changes there and at L1-2, and lumbar spine x-rays indicating only narrowing at L5-S1. The Magistrate Judge also found that those records did not support Cutlip's opinion that Cowgar lacked the "ability to hold any gainful employment," a decision on disability that is reserved for the Commissioner.

After carefully reviewing all of the evidence of record, including lifestyle evidence, credibility evidence and the EMG/NCV study dated October 2004 the Magistrate Judge determined that the ALJ correctly assigned little to no weight to PA Cutlip's notes in

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

the medical record of the Webster County Clinic.  Upon <u>de</u> <u>novo</u> review, the Court agrees that the ALJ correctly considered and analyzed Cutlip's medical notes and assigned the appropriate weight to them. These notes were not consistent with the objective medical evidence in the record, and, as earlier in the discussion relating to SSR 06-03p, an unacceptable medical source, such as a physician's assistant, cannot "establish the existence of a medically determinable impairment," cannot provide "a medical opinion," and cannot be "considered a treating source." Furthermore, pursuant to the criteria for evaluating evidence from "other" sources in SSR 06-03p, in order for "a medical source [such as Ms. Cutlip] to merit assignment of more weight, she must have "seen the individual more often than the treating source" <u>and</u> must provide "better supporting evidence and a better explanation for his or her opinion." While the record establishes that Cutlip regularly treated Cowgar, objective medical evidence from acceptable medical sources does not support her opinions as to Cowgar's physical condition.

As to Dr. Mace, the Magistrate Judge noted that "[his] sole report in the record is his signature on the 'General Physical' report completed by Ms. Cutlip in July 2004." Numerous medical

notes from the Clinic contain illegible signatures; nevertheless, from his careful review of the Clinic's records, the Magistrate Judge concluded that it was Ms. Cutlip, not Dr. Mace, who regularly examined Cowgar and prescribed treatment for him.

The March 25, 2005 West Virginia Department of Health and Human Resources General Physical report signed by Dr. Mace and PA Cutlip indicated a diagnosis of muskuloskeletal back pain, with burning to the left leg and chronic aching and ulnar nerve compression. It further indicated Cutlip's opinion that Cowgar was not currently able to work full time because he could not lift, sit or stand for prolonged periods of time, and that the expected duration of his inability to work was one year. Cutlip therefore recommended further testing or treatment, a consultation with a neurosurgeon, and referral for vocational rehabilitation. From all of this, particularly Cutlip's referral of Cowgar for vocational training, the ALJ determined that Cowgar retained the ability to perform some type of employment.

The Court concludes that the ALJ correctly assigned little to no weight to the medical evidence from Dr. Mace based on its inconsistency with the objective medical evidence of record, the

evidence of Cowgar's daily activities, and the minimal amount of time Dr. Mace, himself, spent with Cowgar.

### 2.   Dr. Lohr

The ALJ also correctly assigned little weight to the opinion of Dr. Lohr, a chiropractor. Pursuant to SSR 06-03p, a chiropractor, such as Dr. Lohr, is considered an unacceptable medical source and, therefore, like the opinion of PA Cutlip, his opinion must be evaluated as an "other" source. The ALJ found that his opinions that 1) Cowgar was not capable of performing any full-time job, that is 8 hours per day, five days per week, on a sustained basis" and was limited to sedentary to light work on an infrequent basis for short periods of time, and 2) "Cowgar suffers from injury to his low back which is permanent and progressive in nature, his prognosis would have to be considered poor" were inconsistent with the objective medical evidence in the record. Specifically, the ALJ noted that the EMG/NCV study had indicated only mild herniation at L5-S1 with degenerative changes there and at L1-2, and lumbar spine x-rays had indicated only narrowing at L5-S1.

### 3.   Cowgar's Credibility

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

The ALJ also noted inconsistencies in the evidence provided by Cowgar, including his statement on a March 21, 2004 daily living form that he did not nap during the day, while his testimony at the hearing indicated he would lie down several times during the day and drift off. Further, on April 5, 2004, as part of an independent medical examination, Cowgar had reported that he did not work for two years after his 2001 injury. The evidence of record, however, established that he had worked full-time in both 2002 and 2003. Moreover, the Magistrate Judge noted that Cowgar had reported that his activities of daily living included preparing a full breakfast and dinner, doing house work, paying bills, washing dishes, taking out trash with help, going shopping, walking and driving a car.

Consequently, due to the inconsistencies in the record, and the fact that the objective medical evidence, including lumbar MRIs and lumbar spine x-rays, failed to support Cowgar's complaints of debilitating pain, the ALJ determined that Cowgar was not entirely credible and assigned lesser weight to on Cowgar's subjective complaints regarding the intensity of his pain and the limitations from his pain.   The Court concludes that there was substantial evidence in the record to support the ALJ's assessment that little weight should be assigned to this evidence.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

### 4.    Drs. Lauderman and Osborne

The Magistrate Judge noted that the ALJ also had based the RFC determination on the June 2004 physical RFC assessment from Dr. Lauderman, and the August 2004 physical RFC assessment from Dr. Osborne. In the June 7, 2004 Physical RFC, Dr. Lauderman had indicated that Cowgar could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8 hour workday, had unlimited ability to push or pull, and had no postural, manipulative, visual, communicative or environmental limitations. In the August 12, 2004 physical RFC, Cynthia Osborne, D.O., indicated that Cowgar had the ability to occasionally lift or carry 50 pounds, frequently lift or carry - 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8 hour workday, had unlimited ability to push or pull, and had no postural, manipulative, visual, communicative or environmental limitations.

Significantly, Drs. Lauderman and Osborne both questioned Cowgar's credibility since it appeared to them that he had exaggerated his symptoms. After considering the subjective complaints of pain and the limitations reported by Cowgar, they

both determined that their examination results did not conform to Cowgar's subjective complaints and self-reported limitations. Nevertheless, Dr. Lauderman  reduced Cowgar's RFC due to pain, and Dr. Osborne set his RFC at medium.

After careful review of the evidence of record, the Magistrate Judge determined that the ALJ had followed the guidelines set forth in the regulations, had thoroughly reviewed all of the evidence of record, and had assigned the correct weight to the objective medical evidence and the evidence from other sources. This Court agrees that there is substantial evidence in the record to support the ALJ's RFC that Cowgar retained the ability to perform medium work with no climbing ladders, ropes or scaffolds, no exposure to temperature extremes, a low stress environment with no production line type of pace or independent decision making responsibilities, involving unskilled work with only routine and repetitive instructions and tasks and only occasional interaction with others.

**C.    Mental Residual Functional Capacity**

According to Cowgar, the Magistrate Judge erred in determining that the evidence of record substantially supports the ALJ's finding regarding his mental RFC, specifically with respect to the ALJ's evaluation of the March 17, 2005 report of Cynthia Hagan, MA.

33

He contends that 1) the "GAF score does not have a direct correlation to functional ability and is the opinion of the psychologist or psychiatrist of the client/patient's functioning on the day of the examination and a short time before," 2) the "functioning is assessed at a time when the individual is not under the stress of work," and 3) "the mental RFC is a prediction of how the individual would be expected to perform and sustain work functions in a competitive work environment."

20 C.F.R. Pt. 404, Subpt P, App1, Listing 12.06 provides:

> Anxiety Disorders: In these disorders, anxiety is either the predominant disturbance or is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> <u>The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied:</u>
>
> A. Medically documented findings of at least one of the following:
>
> 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>
>> a, motor tension; or
>> b. Autonomic hyperactivity; or
>> c. Apprehensive expectation; or

d. Vigilance and scanning;

OR

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in a least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence or pace; or

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

4. Repeated episodes of decompensation
each of extended duration.

OR

C. Resulting in complete inability to function
independently outside the area of one's own
home.

The ALJ determined:

. . . The Administrative Law Judge believes
that the claimant is exaggerating his symptoms
very substantially. The finding of a 51 GAF is
certainly not supported by the examination,
nor by the longitudinal records showing few
complaints of depression or anxiety with good
results from Wellbutrin with no change in
dosage since May 2004, and it is clearly based
solely on the claimant' subjective complaints.
As noted earlier, the PRTF found under the 'B'
criteria that the claimant had one or two
episodes of decompensation, which has no
support at all. Furthermore, in the mental
residual functional capacity, the evaluator
reported that [claimant] sic had been unable
to work due to his mental impairments since
December 1999, when in fact he had been
working from June 2000 to January 2004, with
the one break in May 2001, due to his back
complaints, which greatly detracts from weight
given to this hired psychological evaluator.
Finally, the evaluator never assessed more
than moderate limitations in the mental
residual functional capacity.

However, giving the claimant the maximum
benefit of the doubt even though he is not
very credible, and considering the long
history of borderline intellectual functioning
as evidenced in his school records, even

36

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> though he has been able to work in the timber
> industry for many years, his mental
> impairments have been found to be severe in
> that they would limit him to work in low
> stress environment with no production line
> type of pace or independent decision making
> responsibilities, which is unskilled work
> involving only routine and repetitive
> instructions and talks, with no more than
> occasional interaction with others as found.

Cowgar relies on the March 2005 psychological report from Ms. Hagan, in which she diagnoses depressive disorder and anxiety disorder, borderline intellectual functioning, a GAF of 51 and recommends referral to a psychiatrist to assess the need for medications, counseling to address his depressive and anxious conditions, and referral to a pain treatment clinic. On April 4, 2005, Ms. Hagan also completed a mental RFC assessment that indicated mild to moderate mental work-related limitations and a Psychiatric Review Technique Form that indicated only mild restriction in activities of daily living, mild restriction in difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and one to two episodes of decompensation, each of extended duration.

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

The ALJ reviewed not only Ms. Hagan's report and assessment but also the February 1, 2006 psychiatric evaluation from Dr. Urick. That evaluation indicated a diagnosis of Axis I: 300.00 Anxiety Disorder NOS, Axis II: V62.89 Borderline Intellectual Functioning (by prior psychological testing), Axis III: Diagnosis deferred – patient reports chronic hip and back pain, Axis IV: Problems with social environment, Axis V: GAF 65 and a fair prognosis. Dr. Urick also noted that:

> He has been employed several times, but says the [sic] he is unemployed now and cannot work because of physical issues. <u>When I asked if he felt that his anxiety affected his ability to work, he stated 'No.</u>' He is applying for SSI on the basis of physical problems. He lives alone and reports that his father and two brothers are supportive. He states that he has no income and is not covered by medical insurance.
>
> . . .
>
> <u>Recommendations</u>: 1) In order to address anxiety, as the patient identifies as being somewhat distressing to him, we will try Paxil 20 mg qd; 2) The patient is encouraged to participate in supportive counseling; 3) Crisis intervention as appropriate; 4) RTC 1 month.

(Emphasis added.)

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

The _Diagnostic and Statistical Manual of Mental Disorders_ ("_DSM-IV_"), 32 (4th ed. 1994), provides that a GAF of 51-60 indicates **moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). (Emphasis in original). The DSM-IV provides that a GAF of 61 to 70 indicates **some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** (Emphasis in the original). Here, the Magistrate Judge determined that the ALJ had correctly concluded that, based on Cowgar's own report regarding his activities of daily living, including his ability to cook, clean, socialize with family, and get along with others, a GAF of 65 or more accurately reflected his functional level.

Cowgar next alleges that the ALJ erred in failing to express his mental RFC in terms of work-related functions rather than in vocational categories (such as "medium work"). He relies on SSR 96-8p, which provides in pertinent part:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

* * *

The RFC assessment must be based on all of the relevant evidence in the case record, such as:

Medical history,

Medical signs and laboratory findings,

The effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication),

Reports of daily activities,

Lay evidence,

Recorded observations,

Medical source statements,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment,

Evidence from attempts to work,

Need for a structured living environment, and

Work evaluations, if available.

SSR 96-8p defines RFC as

what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairments including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.

After careful review of the evidence, the Magistrate Judge determined that the ALJ's RFC followed the directives of SSR 96-8p and provided specific work-related functions. As already noted, the ALJ had determined that Cowgar could work "in a low stress environment with no production line type of pace or independent decision making responsibilities," was "limited to unskilled work involving only routine and repetitive instructions and tasks," and had "no more than occasional interaction with others." The Magistrate Judge found that, in making those determinations, the ALJ had done more than merely classify a specific vocational

category. Accordingly, he found that the record contained substantial evidence to support the ALJ's mental RFC findings. The Court agrees.

D.  **Hypothetical Question  - Vocational Expert**

Cowgar contends that the ALJ failed to follow SSR 96-8p in connection to his hypothetical question to the vocational expert ("VE").

Here, the ALJ posed the following hypothetical to the VE:

Q.   . . . then let me ask you to assume a hypothetical individual of the claimant's age, educational background and work history who would be able to perform medium work but could not climb ladders, ropes, or scaffolds; should not be exposed to temperature extremes; to work in a low-stress environment with no production line type case with independent decision-making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others. And would there be any work in the regional or national economy that such a person could perform?

A.   Yes, there would, Your Honor, at the medium level with those limitations, the following jobs. There are vehicle washers, 630 local, 140,000 national. And the local area I'm referring to is northern West Virginia and southwestern Pennsylvania. In addition to vehicle washers there are janitors, 11,500 local, 1,500,000 nation. There are also medium hand packers, 400 local, 118,000 nation. Spot handlers, spot clerks, 1,700 local, 700,000 nation. These are all medium, unskilled jobs.

Q.   All right. And if you were reduced to the light level, add a sit/stand option and add that the person could do

postural movements only occasionally, such as no ladders, ropes, or scaffolds, everything, the other limitations?

A.    There is additionally (INAUDIBLE) at the light level, Your Honor, the following jobs. There are laundry folders, 300 locally, 48,000 nation. There are labelers and markers, 300 local, 64,000 nation. There are sorters and graders, 200 local, 49,000 nation. Inspector, checkers of small products, 800 local, 111,000 nation. There are all light jobs.

Q.    And finally – Well, go to sedentary with the same other limitations

A.    At the sedentary level there would be similar types of jobs, inspector, checkers, 150 local, 37,000 nation. (INAUDIBLE) and graders 100 local, 20,000 nation. Waxers of glass products, 160 local, 66,0000 nation.

In <u>Walker v. Bowen</u>, 876 F.2d 1097, 1101 (4th Cir. 1989), the

Fourth Circuit held:

> For vocational expert's opinion to be relevant or helpful in disability benefits proceeding, it must be based upon consideration of all other evidence in the record and must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.

The Magistrate Judge determined that the ALJ's hypothetical question included all of the limitations substantiated by the medical evidence contained in the record and, therefore, accurately reflected all of impairments supported by the evidence of record. The Court agrees.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

## VII. <u>CONCLUSION</u>

Upon examination of the plaintiff's objections, it appears to the Court that Cowgar has not raised any issues that were not thoroughly considered by Magistrate Judge Seibert in his R&R. Moreover, upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances in this action. Therefore, it **ORDERS** that Magistrate Judge Seibert's Report and Recommendation be accepted in whole and that this civil action be disposed of as recommended. Accordingly,

1.  the defendant's motion for Summary Judgment (Docket No. 13) is **GRANTED**;

2.  the plaintiff's motion for Summary Judgment (Docket No. 10) is **DENIED**; and

3.  this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

The Clerk of the Court is directed to transmit copies of this

Order to counsel of record.

DATED: September 17, 2008.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE